IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| THE EAGLE ALLIANCE, | |
| | |
| COMPUTER SCIENCES CORPORATION, | |
| | |
| and | |
| | |
| CSC GOVERNMENT SOLUTIONS LLC | Case No. 1:15-cv-02695-JKB |
| | |
| Plaintiffs, | |
| | |
| v. | |
| | |
| ANTHONY QUATTRONE, | |
| | |
| | |
| Defendant. | |

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure and as and for their

First Amended Complaint for Injunctive Relief and Damages against Defendant Anthony

Quattrone ("Mr. Quattrone"), Plaintiffs The Eagle Alliance ("Eagle Alliance"), Computer

Sciences Corporation ("CSC"), and CSC Government Solutions LLC ("CSGov") (collectively,

the "Company") state and allege as follows:

**NATURE OF THE ACTION**

1.      This is an action against Mr. Quattrone for tortious conduct stemming from his

misappropriation of the Company's trade secrets.

2.      Until Mr. Quattrone's employment ended on May 29, 2015, he was employed by

CSC, but assigned to work for Eagle Alliance, which was, at the time, a joint partnership

between CSC and Northrop Grumman Systems Corporation ("Northrop Grumman"), for which

CSC served as the managing partner.  Mr. Quattrone's role for Eagle Alliance was as the Capture

Manager on a highly competitive, ten-year, multi-billion dollar information technology

government contract procurement opportunity with the National Security Agency of the

Department of Defense, known as Greenway.  As Capture Manager for this high-stakes

procurement effort, Mr. Quattrone's role was to assemble and manage a team of experts whose

job was to develop the strategy and plan for Eagle Alliance's efforts to obtain and perform the

Greenway contract.  As the Greenway Capture Manager, Mr. Quattrone had access to highly

confidential, non-public, strategic and planning documents relating to Eagle Alliance's efforts to

bid on, win and perform the Greenway contract.

3.      Before beginning employment with CSC, Mr. Quattrone executed a

Nondisclosure Agreement with CSC and its affiliate entities, including Eagle Alliance, which,

among other obligations, required him to return all Company property at the end of his

employment, and prohibited his disclosure of Company business data and contractual

relationships the Company has with any customers, contractors and subcontractors.

4.      Mr. Quattrone was removed as the Greenway Capture Manager in late April or

early May 2015, due to performance issues on the part of Mr. Quattrone with respect to his work

on the Greenway procurement effort. Mr. Quattrone's employment with CSC subsequently was

terminated on May 29, 2015 due to a reduction in force. Two days before his last day of

employment, however, among other wrongful actions, Mr. Quattrone transmitted to his personal

email account numerous confidential, proprietary, and protected Company documents, some of which constitute trade secrets.

5.      Shortly after his employment ended, Eagle Alliance was informed that Mr. Quattrone had accepted employment with AT&T Government Solutions ("AT&T"), a direct competitor of the Company.  Moreover, Eagle Alliance also was informed that Mr. Quattrone was working for AT&T on the very same Greenway procurement effort for which he previously had worked for the Company, and for which the Company trade secrets he misappropriated are highly relevant and potentially damaging to the Company's competitive advantage.

6.      For various reasons described herein, the Company initiated an internal forensic investigation to determine whether Mr. Quattrone had removed any confidential electronic data from the Company's computer systems.

7.      As a result of this forensic investigation, the Company discovered that after Mr. Quattrone was removed as Capture Manager on the Greenway procurement but prior to his last day of employment, he inserted a portable USB device into his Company laptop and emailed to his personal email address numerous confidential and proprietary Company documents, some of which constitute trade secrets.

8.      Additionally, as a result of initial discovery conducted in this litigation, the Company learned that Mr. Quattrone had transmitted (prior to the termination of his CSC employment) additional emails from his CSC email address to his personal email address containing confidential Company information and trade secrets and further, that Mr. Quattrone had accessed certain Company trade secrets from his AT&T Company-issued laptop computer.

9.      Mr. Quattrone's unlawful actions have caused irreparable harm to the Company and, unless enjoined and restrained from further misconduct, the Company will continue to suffer such harm to its legitimate and protectable business interests.  In addition to injunctive relief, the Company has incurred financial harm from Mr. Quattrone's misconduct and seeks compensatory, punitive, and exemplary damages, as well as reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## THE PARTIES

10.      Plaintiff CSC is a Nevada Corporation, and its principal place of business is Virginia.

11.      Plaintiff Eagle Alliance is a Joint Partnership between CSGov and Northrop Grumman.  Northrop Grumman is a Delaware Corporation, with its principal place of business in Virginia.

12.      Plaintiff  CSGov is a Nevada limited liability company and its principal place of business is Virginia.  CSGov is an operating company of the newly-formed, publicly-held CSRA Inc., which was formed as a result of the spin-off of the North American Public Sector segment of CSC on November 27, 2015, and its merger on November 30, 2015 with SRA International Inc.

13.      Upon information and belief, Defendant Quattrone is an individual who is a Maryland citizen and resides at 8890 Stanford Boulevard, Columbia, Maryland.

## JURISDICTION AND VENUE

14.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because Mr. Quattrone resides, and a substantial part of the events giving rise to the causes of action occurred, in the District of Maryland.

## GENERAL ALLEGATIONS

### *Eagle Alliance Business*

16.    Eagle Alliance initially was formed in March 2001 by Logicon Inc. ("Logicon"), a Northrop Grumman company, and CSC for the express purpose of procuring, entering into and performing a multi-billion dollar contract with the National Security Agency ("NSA") called Groundbreaker.  During Mr. Quattrone's employment, CSC was the managing partner of Eagle Alliance and was responsible for its operation and management.  CSGov currently is the managing partner of Eagle Alliance and is responsible for its operation and management.

17.    The Groundbreaker contract was awarded to Eagle Alliance for an initial seven-year term to provide the national security intelligence community with information technology services.  In July 2001, when Eagle Alliance was awarded this contract, Groundbreaker was the largest information technology outsourcing program in which the NSA had ever engaged.  In 2007, the Department of Defense exercised a three-year option to continue the Groundbreaker contract through September 2011.  In 2009, Eagle Alliance was awarded a three-year contract extension, further extending the Groundbreaker contract through September 2014.

18.     In 2007, as the result of a corporate reorganization, Northrop Grumman Corporation assigned Logicon's partnership interest in Eagle Alliance to Northrop Grumman Information Technology, Inc.  An Amended and Restated Partnership Agreement was executed in December 2014 substituting Northrop Grumman Systems Corporation for Northrop Grumman Information Technology, Inc. in the partnership.

19.     In 2013, Eagle Alliance was again awarded a contract extension, for two years (through September 2016), with a potential one-year extension which would allow services to continue through September 2017.

20.     In anticipation of the government's transformation and expansion of the Groundbreaker contract, beginning in 2011, Eagle Alliance began its planning efforts to procure the contract expected to replace and materially expand upon the services provided as part of the Groundbreaker contract.  This forthcoming expanded contract is known as Greenway.

21.     To succeed in its procurement efforts to win the Greenway contract, the Company has developed, compiled, and maintained confidential information and trade secrets relating to these efforts.  These trade secrets include: information regarding the Company's strategic and technical methodologies and plans for bidding on, competing and winning the Greenway contract; information regarding staffing and cost-related information for current and potential contracts, including professional staffing, salaries, wages, bidding rates, overhead, G&A and escalation factors; information regarding the Company's existing contracts and contracts for which the Company may compete; and information regarding teaming agreements the Company may seek to enter into in order to effectively win and perform the Greenway contract.

22.     The Company's trade secrets related to the Greenway procurement are the product of years of the Company's time and effort as well as its expenditure of millions of dollars.

23.     The Company's trade secrets related to the Greenway procurement also are the result of exclusive information available to the Company as the result of Eagle Alliance's status as the incumbent contractor on the Groundbreaker contract, which contract Greenway is slated to replace and materially expand upon.  In its role on the Groundbreaker contract, Eagle Alliance is in a unique position to develop intelligence regarding the NSA's special interests, needs, strategies and goals with regard to Groundbreaker's replacement and expansion in the form of Greenway.

24.     The Company's trade secrets related to the Greenway procurement are sufficiently secret to derive economic value because they are not generally known to the government contracting industry or publicly available.  Nor is such information readily accessible or easily compiled and reproduced by competitors or others by lawful means.  For these and other reasons, the Company's trade secrets afford the Company a competitive advantage.

25.     The Company has taken reasonable measures to maintain the secrecy of its trade secrets.  Those measure include, without limitation, the following:

- requiring employees to execute Non-Disclosure Agreements;

- marking all confidential material with a legend, such as "CSC Proprietary" or "CSC Competitive Sensitive," that identifies the material as proprietary or confidential;

- utilizing a secure Company computer network with password-sensitive log-on credentials required (which must periodically be changed for security purposes);

- prohibiting Eagle Alliance employees and CSC employees working on the Greenway team from plugging in any USB or external hard drives to Company laptops at any Eagle Alliance facility;

- prohibiting employees and visitors from bringing certain devices, such as USB and hard drives, into the Eagle Alliance facilities absent special permission;

- numbering any hard copies of confidential documents that need to be circulated during a meeting, and collecting such copies at the end of the meeting;

- storing all Greenway procurement documents in a secure network folder with carefully controlled access;

- limiting access to the Greenway electronic procurement folder and having a dedicated employee responsible for monitoring and limiting the personnel to whom privileges are assigned for accessing the electronic folder; and

- restricting physical access to various spaces within the Eagle Alliance facilities.

26. The Company also has a number of policies governing the use, restriction of access to, designation of, and encryption of sensitive, confidential, non-public, proprietary documents, intellectual property, and trade secrets including but not limited to:

- Eagle Alliance Intellectual Property Policy;

- Access Policy;

- Records and Information Management Policy;

- Information Security Policy;

- Encryption Policy; and

- Prohibited Items, Removable Media, and Restricted Items Policy.

27.     If the Company's trade secrets relating to the Greenway contract procurement effort are disclosed to or used by a competitor, such competitor would be able to unfairly compete against the Company in its efforts to win the Greenway contract.  Under such circumstances, the economic value of the Company's trade secrets would be irreparably damaged, if not completely lost, as the Company seeks to procure the Greenway contract.

### *Mr. Quattrone's Employment*

28.     When Mr. Quattrone became employed by CSC in April 2011, he was immediately assigned to Eagle Alliance as the Capture Manager, leading Eagle Alliance's efforts on the Greenway contract procurement.  As Capture Manager for this high-stakes procurement effort, Mr. Quattrone's role was to assemble and manage a team of experts whose job it was to develop the strategy and plan for Eagle Alliance's efforts to obtain and perform the Greenway contract.  During this time, Mr. Quattrone physically worked approximately half-time at Eagle Alliance's office in Annapolis Junction, Maryland.

29.     In his position as Greenway Capture Manager, Mr. Quattrone had intimate knowledge of Eagle Alliance's strategy and planning related to the Greenway procurement, as well as knowledge of and access to highly confidential and proprietary information, including trade secrets, related to Eagle Alliance's current performance as the incumbent on the Groundbreaker contract, the contract Greenway is slated to replace and materially expand upon.

30.     At the beginning of his employment with CSC, Mr. Quattrone executed an Assignment of Inventions and Covenant Against Disclosure Agreement in March 2011 (the

"Nondisclosure Agreement") which, among other obligations, required Mr. Quattrone to return all Company property and data at the end of his employment, and prohibited disclosure of CSC business data and contractual relationships the Company has with any customers, contractors and subcontractors.

31. In Paragraph 4 of the Nondisclosure Agreement, Mr. Quattrone agreed that work product he created, in whole or in part, "shall become the absolute property of CSC."

32. Paragraph 6 of the Nondisclosure Agreement required Mr. Quattrone to return all CSC property to the Company at the time of his termination:

> Upon termination of my employment at CSC, whether voluntary or involuntary, I shall return to CSC all of its property of which I have had custody, including all handbooks, manuals, notebooks, . . . disks, . . . records, statistics, data, and other items which I have acquired by virtue of my employment.

33. In addition, in connection with the end of his employment, Mr. Quattrone executed an Employee Separation Clearance Form certifying that he had returned all Company assets and data.  This document, which has been redacted, is attached as **Exhibit A** and incorporated herein by reference.

### *Mr. Quattrone's Misappropriation of Company Trade Secrets*

34. Mr. Quattrone began actively seeking a position outside of CSC in late 2014 or early 2015.

35. In or about late April or early May 2015, Mr. Quattrone was removed as Capture Manager on the Greenway procurement as a result of his performance issues with respect to the Greenway contract procurement effort.

36. Upon information and belief, on or about April 25, 2015, Mr. Quattrone interviewed for a position with another company working on the Greenway procurement.

37.     Mr. Quattrone was transferred to a different role with CSC after he was removed as Capture Manager on the Greenway contract procurement, until this position with the Company subsequently was eliminated.  Mr. Quattrone's final day of employment with CSC was May 29, 2015.

38.     Shortly after his employment with CSC ended, the Company was informed that Mr. Quattrone had accepted employment with AT&T, an Eagle Alliance competitor on the Greenway procurement, among other competitive activities.

39.     Subsequently, Eagle Alliance also was informed that Mr. Quattrone was actually assigned to work as a project manager on behalf of AT&T on the very same Greenway procurement project and in substantially the same capacity on which he had been engaged while working for the Company.

40.     Concerned that Mr. Quattrone could be in a position to violate his on-going confidentiality and non-disclosure obligations to the Company, the Company wrote to Mr. Quattrone on June 30, 2015 to remind him of these on-going obligations to Eagle Alliance and CSC.  A copy of this correspondence is attached hereto as **Exhibit B** and incorporated herein by reference.

41.     On July 20, 2015, the Company also wrote to AT&T to inform that entity of Mr. Quattrone's on-going obligations to Eagle Alliance and CSC.  A copy of this correspondence is attached hereto as **Exhibit C** and incorporated herein by reference.

42.     Upon information and belief, Mr. Quattrone aggressively and successfully recruited two Eagle Alliance employees staffed on Eagle Alliance's Greenway procurement efforts to leave Eagle Alliance and to join AT&T.  These employees, similar to Mr. Quattrone,

had intimate knowledge of the Company's strategy and planning related to the Greenway

procurement, as well as sensitive information related to Eagle Alliance's current performance as

the incumbent on the Groundbreaker contract.

43.     In light of the departures of Greenway team members, the Company initiated an

internal forensic investigation to determine whether any of these employees, including Mr.

Quattrone, had removed any confidential electronic data or trade secrets from the Company's

computer systems.

44.     As a result of its forensic investigation, the Company discovered that on May 15,

2015, after he began interviewing with at least one other company but prior to his last day of

employment at CSC, Mr. Quattrone inserted a Maxtor Onetouch USB Drive, serial number

2HAP2PER____&0 into his CSC-issued laptop.

45.     Pursuant to Eagle Alliance's "Prohibited Items, Removable Media, and Restricted

Items Policy," Mr. Quattrone was prohibited from possessing and/or using removable media

devices, including this USB thumb drive, at the Eagle Alliance facility.

46.     As a result of its forensic investigation, the Company also discovered that two

days before his last day of employment with the Company, Mr. Quattrone emailed to his

personal email address numerous confidential and proprietary Company documents.

47.     Specifically, the Company discovered that on Wednesday, May 27, 2015 between

7:55 a.m. and 8:19 a.m., Mr. Quattrone sent four emails attaching confidential and proprietary

Company documents from his Company email address (aquattrone@csc.com) to a personal

email address assigned to him (tonyquattrone@msn.com).

48.     The first email, transmitted at 7:55 a.m., attached a PDF filed titled "Visio-ICITE Partners.pdf."  The PDF includes a "CSC Proprietary & Confidential" designation and contains sensitive, confidential, non-public information related to numerous government contracts, including Groundbreaker and Greenway.  This information includes:

- detailed information regarding numerous intelligence-related government contracts on which CSC had bid or intended to bid;

- business intelligence related to potential competitors on each such contract; and

- the identity of CSC's potential subcontractors and partners.

49.     As part of this litigation, the Company discovered that Mr. Quattrone also removed from Company property the Visio-ICITE Partners PDF in hard copy.

50.     Mr. Quattrone subsequently destroyed this document in hard copy.

51.     According to correspondence between AT&T and Mr. Quattrone, signed by Mr. Quattrone on October 5, 2015, attached hereto as **Exhibit D**, Mr. Quattrone accessed the Visio-ICITE Partners PDF using his AT&T Company-issued laptop on July 23, 2015, July 28, 2015, and August 14, 2015.

52.     The Visio-ICITE Partners PDF contains Company trade secrets.

53.     The second email the Company discovered as part of its initial forensic analysis that Mr. Quattrone forwarded from his CSC email account to his personal email account, transmitted at 8:06 a.m. on May 27, 2015, attached a PowerPoint Presentation entitled "Capture Director April 1, 2014."  The PowerPoint Presentation includes a "CSC Proprietary" designation and contains confidential information regarding the Company's unique capture and procurement

procedures, and the business methods developed by the Company and utilized in all its procurement efforts, including the Greenway procurement.

54.     As part of this litigation, the Company discovered that Mr. Quattrone also had previously emailed the PowerPoint Presentation entitled "Capture Director April 1, 2014" from his CSC email account to his personal email account on May 1, 2015 at 9:13 a.m.

55.     Upon information and belief, Mr. Quattrone accessed the Capture Director April 1, 2014 PowerPoint Presentation using his AT&T Company-issued laptop on July 23, 2015.

56.     The third email the Company discovered as part of its initial forensic analysis that Mr. Quattrone forwarded from his CSC email account to his personal email account, transmitted at 8:11 a.m. on May 27, 2015, attached a PowerPoint Presentation entitled "GREENWAY Dashboard 27 Feb 2015."  The PowerPoint Presentation contains a "CSC Competitive Sensitive" designation and includes an array of confidential, non-public information related to the Greenway procurement, including:

- the Company's analysis of its own vulnerabilities and potential areas of weakness to be addressed regarding specific aspects of the Greenway procurement;

- the Company's internal, business intelligence regarding the government's specific contracting concerns as to which the Company had gained insight by virtue of its status as the incumbent contractor on the Groundbreaker contract;

- the Company's analysis of its progress as to various aspects of its Capture Planning strategy;

- the identity of the Company's proposed teammates on the Greenway contract who would assist the Company in meeting various aspects of the government's requirements (including subcontractors); and

- the identity of various expert personnel with whom the Company intended to propose staffing the Greenway contract, if successful.

57.     Upon information and belief, Mr. Quattrone accessed the GREENWAY Dashboard 27 Feb 2015 PowerPoint Presentation using his AT&T Company-issued laptop on July 28, 2015.

58.     The GREENWAY Dashboard 27 Feb 2015 PowerPoint Presentation contains Company trade secrets.

59.     The fourth email the Company discovered as part of its initial forensic analysis that Mr. Quattrone forwarded from his CSC email account to his personal email account, transmitted at 8:19 a.m. on May 27, 2015, included the subject line "All GW dashbds" and attached a PowerPoint Presentation entitled "Weekly Status Quattrone."  The PowerPoint Presentation Mr. Quattrone forwarded to himself contains an array of confidential, non-public information related to the Greenway procurement, including:

- information related to the intelligence the Company had collected regarding potential issues with the Greenway contract; and

- information related to the intelligence the Company had collected regarding specific competitor and teaming partner activities on the Greenway procurement.

60.     This PowerPoint Presentation should have been designated as "CSC Competitive Sensitive" but was not so designated.  It was Mr. Quattrone's responsibility to include such designation on this document, and he failed to do so.

61.     Upon information and belief, Mr. Quattrone accessed the Weekly Status Quattrone PowerPoint Presentation using his AT&T Company-issued laptop on July 23, 2015 and July 28, 2015.

62.     The Weekly Status Quattrone PowerPoint Presentation contains Company trade secrets.

63.     On May 29, 2015, Mr. Quattrone, in connection with this off-boarding from CSC, executed an Employee Separation Clearance Form in which he certified that he had returned all Company assets and data.  This certification was false.

64.     As a result of initial discovery in this litigation, the Company also has learned that in the months leading up to the end of Mr. Quattrone's employment with CSC, while he was actively seeking new employment outside of CSC including with CSC competitors, he emailed from his CSC email address to his personal email address, and continued to possess following the end of his employment with CSC, numerous other documents that constitute the Company's confidential information and/or trade secrets without Company authorization.

65.     For instance, on January 29, 2015 at 11:28 a.m., Mr. Quattrone transmitted from his CSC email address to his personal email address an email with the subject line "CSC Assignments" and three separate Excel spreadsheets as attachments: "Intel Captures.xls," "TQ CSC Captures.xls," and "TQ CSC Captures 22 Oct 2013.xlsx."

66.     These attachments contain confidential information regarding the Company's intent to bid on specific government contracts, including its internal staffing assignments and whether it intended to bid on specific government contracts as a prime or sub-contractor.

67.     On January 30, 2015, Mr. Quattrone transmitted from his CSC email address to his personal email address an email with the subject line "Fw: Greenway – CONFIDENTIAL," which contains confidential, non-public information regarding the Company's internal assessment of the status of the Greenway procurement and analysis of the procurement team's work performance.

68.     On January 30, 2015, Mr. Quattrone transmitted from his CSC email address to his personal email address an email with the subject line "Healthcare deal" and an attachment titled "VA Electronic Health Record Open Source Custodial Agent.xlsx."

69.     This attachment contains historic information regarding the status of the Company's efforts related to the procurement of a Virginia Electronic Healthcare contract, including specific procurement-related efforts and the assigned staff members.

70.     On April 16, 2015, Mr. Quattrone transmitted from his CSC email address to his personal email address an email with the subject line "Fw: Win Workshop Pipeline" and an attachment titled "Intel Pipeline as of 2-24-15.finalv1.xlsx."

71.     This attachment, which was drafted by another Company employee, contains detailed information regarding *all* current government contracts and anticipated contracting opportunities on which the Company had or intended to bid in the national security space, including internal staffing assignments and efforts, details regarding Company procurement strategy, and the status of the Company's procurement efforts for those government contracts.

72.     Mr. Quattrone accessed the Intel Pipeline as of 2-24-15.finalv1.xlsx spreadsheet using his AT&T Company-issued laptop.

73.     This document contains Company trade secrets.

### COUNT I:
### VIOLATION OF MARYLAND UNIFORM
### TRADE SECRETS ACT (MD. COM. L. CODE §§ 11-1201 *ET SEQ.*)

74.     The Company restates and realleges Paragraph Nos. 1 through 73 as and for this Paragraph No. 74 of Count I.

75.     Certain of the Company's confidential information misappropriated by Mr. Quattrone, as described herein, constitute the Company's trade secrets under Section 11-1201(e) of the Maryland Uniform Trade Secrets Act (MD. COM. L. CODE §§ 11-1201 *et seq.* (the "MUTSA")).  Specifically, the following information, without limitation, constitutes the Company's trade secrets:

- the Company's analysis of its vulnerabilities and areas of potential weaknesses to be addressed regarding specific aspects of the Greenway procurement, as described in Paragraphs 56-58 herein;

- the Company's business intelligence regarding government concerns to which the Company had gained insight by virtue of its status as the incumbent contractor on the Groundbreaker contract, as described in Paragraphs 56-58 herein;

- the Company's progress toward fulfilling its Capture Planning strategy on the Greenway procurement, as described in Paragraphs 56-58 herein;

- the Company's strategy, decisions, and selections regarding the proposed identity of the Company's government contractor/teammates on the Greenway contract (including subcontractors), as described in Paragraphs 56-58 herein;

- the Company's strategy, decisions, and selections regarding the identity of various expert personnel with whom the Company intended to propose staffing the Greenway contract if successful, as described in Paragraphs 56-58 herein;

- the Company's intelligence regarding the government's potential concerns and issues with the Groundbreaker contract and Greenway procurement, as described in Paragraphs 59-62 herein;

- the Company's competitive intelligence regarding specific competitor and teaming partner activities on the Greenway procurement, as described in Paragraphs 59-62 herein;

- the Company's detailed, non-public information regarding numerous national security/intelligence-related government contracts on which CSC had bid or intended to bid, as described in Paragraphs 59-62 herein; and

- the Company's competitive intelligence related to potential competitors on each such contract, as described in Paragraphs 48-52 herein;

- information regarding current government contracts and anticipated contracting opportunities on which the Company had or intended to bid in the national security space, including internal staffing assignments and efforts, and details regarding strategy the status of the Company's procurement efforts for those government contracts, as described in Paragraphs 70-73 herein.

76.     The Company's trade secrets derive actual and/or potential commercial value from not being generally known or readily ascertainable through independent development or intelligence-gathering efforts by others seeking to procure the Greenway contract.

77.     The Company has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its trade secrets.

78.     The circumstances of Mr. Quattrone's employment with the Company give rise to statutory obligations under the MUTSA to maintain the secrecy of the Company's trade secrets and to strictly limit their use to Company business activities and for the exclusive benefit of the Company.

79.     Mr. Quattrone misappropriated the Company's trade secrets through improper means in that, among other things, he acquired, disclosed, continued to possess and/or used the trade secrets without the Company's express or implied authority or consent and with knowledge that such information belongs exclusively to the Company, and then falsely certified to the Company that he had returned all Company documents, data and materials.

80.     As a direct and proximate result of the actual, threatened, and/or ongoing misappropriation of the Company's trade secrets by Mr. Quattrone, the Company has sustained and, unless restrained and enjoined, will continue to sustain severe, immediate, and irreparable harm and actual loss to the value of its trade secrets and competitive advantage.

81.     The misappropriation of the Company's trade secrets by Mr. Quattrone was deliberate, willful, malicious, and in disregard of the Company's rights and his statutory obligations to protect such trade secrets.

## PRAYER FOR RELIEF

**WHEREFORE**, the Company respectfully requests the Court to enter judgment in its favor on all counts and award the following relief:

(a)      Permanent injunctive relief to restrain and enjoin Mr. Quattrone from, directly or indirectly, disclosing, using, or relying upon the Company's trade secrets;

(b)      Compensatory, consequential and incidental damages in an amount to be determined at trial;

(c)      Punitive damages in an amount to be determined at trial;

(d)      Exemplary damages pursuant to MD. COM. L. CODE ANN. § 11-1203;

(e)      Reasonable attorneys' fees pursuant to MD. COM. L. CODE ANN. § 11-1204; and

(f)      Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury in this action as to all issues so triable.

Dated: December 11, 2015

Respectfully submitted,

VEDDER PRICE P.C.

By:     /s/ Amy L. Bess
        Amy L. Bess, Bar. No. 14687
        Sadina Montani, Bar No. 10476
        Vedder Price P.C.
        1401 I Street NW
        Suite 1100
        Washington, D.C.  20005
        T:  +1 (202) 312-3320
        F:  +1 (202) 312-3322
        abess@vedderprice.com
        smontani@vedderprice.com

*Counsel for Plaintiffs*
*The Eagle Alliance, CSC, and CSGov*

WASHINGTON_DC/#48498.2